HERGET, Judge.
Plaintiff, Mrs. Alta Boudreaux Champagne, appealed from a judgment of the Trial Court rejecting her demands and dismissing her suit for the wrongful death of her husband, George Champagne, who was killed on July 3, 1962 by an automobile driven by defendant, Roy J. Marmande. Made defendants in the suit were Mar-mande, his liability insurer, Fireman’s Insurance Company, Elward M. Voisin and his liability insurer, Maryland Casualty Company.
In her petition Plaintiff alleges Mar-mande and Voisin were engaged in competitively racing their vehicles on the highway with Marmande in the lead; in consequence of the racing and as a direct cause thereof, George Champagne, her husband, who was engaged in mowing grass on the batture, was killed by the vehicle driven by Marmande, which went off the road onto the shoulder and struck the deceased.
Defendants denied the two drivers were racing and maintained decedent met his untimely death when he precipitously attempted to cross the road pushing the mower across in the path of Marmande’s vehicle. They further maintain Mar-mande’s vehicle did not go onto the shoulder until after it had struck George Champagne in the road.
For written reasons assigned, the Trial Judge concluded the evidence supported Defendants’ contentions.
Decedent resided on the east side of Louisiana Highway 315, which highway meanders along Bayou DuLarge in Terre-bonne Parish. The batture is separated from the property on which Plaintiff’s residence is located by the highway and, accordingly, is on the west side thereof. Mr. Champagne crossed the road to mow a “V-shaped” strip surrounding his mailbox situated on the batture and a strip of grass on the batture parallel to the road. The highway is a two-lane road and at the point where this accident occurred there is a moderately sharp curve in the road. On the evening of the accident defendants, Marmande and Voisin, accompanied by one John McElroy, after finishing work repaired to “The Floating Palace” located near Houma, Louisiana, where they partook of two or three beers each. They left the bar at approximately 6 p. m., Marmande preceding in his automobile, Voisin driving his vehicle closely behind, followed by Mc-Elroy in his vehicle, who, however, had stopped at a house nearby prior to reaching the vicinity of the accident. Defendants testified they were driving in a southerly direction at 55 or 60 miles per hour; the *222 speed limit was 60, but 55 was recommended in a warning sign at the approach of the ■curve. Defendants maintain decedent stepped from the shoulder of the road onto the road on the west side thereof pushing his lawnmower ahead of him into the path of .Marmande’s vehicle. The lawnmower had .a cutting blade powered by the motor, but it had to be propelled manually. Defendants further relate Marmande’s vehicle struck George Champagne and the left handle of the mower. Marmande, upon observing Champagne stepping into his path, vigorously applied the brakes and his ■vehicle was struck by the Voisin car, in consequence of which it swerved to the right following the collision with Champagne onto the west shoulder of the road.
Evidence was offered by the Plaintiff of numerous neighbors and relatives who had seen decedent mowing the grass on the batture immediately prior to the collision, "but none of them saw the collision itself with the exception of Michael Scott, an -eleven year old nephew of Plaintiff, who testified he was sitting in the rear of a parked station wagon some distance down the highway and that he saw the deceased ■standing near the mailbox on the shoulder when he was struck by the Marmande car which had run off the road. It is apparent young Scott was mistaken in his testimony. Accepting his version that decedent was standing near the mailbox when struck and in view of evidence tendered the mailbox was not disturbed or even scratched by ■either vehicle, an impossible circumstance ■of necessary concurrent events, is mute evidence of the fact Scott was mistaken.
The Trial Judge in a well considered opinion rendered judgment rejecting the •demands of Plaintiff principally on his reliance upon the testimony of a State Trooper who reported the accident and whose testimony and observations in regard to the physical findings refuted Plaintiff’s allegation that her husband, when struck, was located on the shoulder of the road, and, to the contrary, makes evident the testimony of Defendants that Mr. Champagne attempted to cross the road in the path of the approaching Marmande car. We adopt and quote the following excerpt from his written reasons:
“It is our view that the most precise and reliable testimony relating to this accident was that given by the State Highway Trooper, who was not moved by any stress or strain or excitement, but went to the place of the accident, examined the scene and found and noted some cold, dispassionate, immutable facts that reactions by one human being or another can not vary. The focal point of the testimony of the State Trooper is a mailbox situated on the west side of the highway. The Marmande car was headed south. The Trooper found skid marks made by that car in its right lane beginning at a point 39 feet north of the mailbox. Thereafter he found a continuation of those skid marks a distance of 78 feet south of the mailbox to a point where the Marmande car began to leave the paved portion of the highway, and rolled onto the west shoulder. He found the body of the decedent on the west shoulder of the highway 90 feet south of the mailbox. The Trooper noted two other significant facts. He found some indication that a pedestrian was hit in the right traffic lane just a short distance, either 10 or 12 feet, south of the mailbox. The lawnmower was found in the left lane of the highway a few feet, 12 or 15 feet, south of the mailbox.
* ‡ * * * *
“I think all of the authorities agree, and I am relying here primarily on the Drivers Guide issued by the Department of Public Safety of the State of Louisiana, that before brakes are applied there is first an apprehension of danger ahead, that the driver sees something that gives him some apprehension of danger, that he is moved by such apprehension of danger to take *223 his foot off the accelerator and apply it to the brakes, and that average reaction time is three-quarters of a second. In brief, there is a lapse of three-quarters of a second from the moment of apprehension of danger ahead and the removal of the foot from the accelerator and its application to the brakes, before braking can become effective. In the absence of any evidence to the contrary, we will have to assume that the average reaction time of the persons involved here was the average reaction time of three-quarters of a second.
“That means that before the 39 feet of skid marks north of the mailbox would have been made, there had to be an apprehension of danger and the lapse of reaction time. Reaction time necessarily involves reaction distance. Thus, if a car is running 60 miles per hour, the traveling speed is 88 feet per second and, reaction time being three-quarters of a second, reaction distance is 66 feet. Thus, if the Mar-mande car was traveling 60 miles per hour, it is evident that the apprehension of the driver took place at a point 105 feet north of the mailbox, being 66 feet of reaction distance plus 39 feet of skid marks.
“Let us examine those facts in the light of human experience. What was it that could have given any apprehension of danger 105 feet north of the mailbox ? It could hardly have been the sight of a person mowing grass on the side of the highway 6 feet from the pavement. In our own experience we see people cutting grass near the highway in settled areas with reasonable frequency and such action can hardly be calculated to cause alarm or arouse apprehension. If such mowing operation is no cause of apprehension or alarm, then the apprehension of the driver of the Marmande car must necessarily have been the result of some other act that causes a reaction on the part of a driver, and the only act that I can find here would necessarily have to be the act of an attempted crossing of the highway. The Trooper’s testimony is that he found some indications that a pedestrian was hit in the right traffic lane either 10 or 12 feet south of the mailbox, indicating the likelihood of an attempted crossing at that point. And Marmande testified to such attempt.
“Let us view the scene in the light of other statistics. We have seen that the point of apprehension was 105 feet north of the mailbox, and that the skid marks in the right traffic lane extended to a point 78 feet south of the mailbox, where the Marmande car began to leave the paved highway. That makes a total distance of 183 feet from the point of apprehension to the point to where the car began leaving the pavement. If the decedent was mowing on the shoulder of the highway, it does not seem to us to be reasonable that there could have been any apprehension at the point of apprehension from seeing the decedent mowing on the side of the highway. Furthermore, if the Marmande car struck the decedent on the shoulder of the highway, it would have had to travel a few feet beyond the point where the car left the pavement. Moreover, if the car struck the mower directly, it is likely that the mower would have moved or had been pushed in the direction in which the car was traveling; or if only the handle of the mower was struck, as appears to be the case here, the mower would have been found in the approximate area where the handle was struck. It is absurd to suppose that the decedent and his mower could have been struck at a point more than 78 feet south of the mailbox, and the mower would have been found at a point only 12 or 15 feet south of the mailbox. It is our view that the impact must necessarily have taken place in the general *224 area where the mower was found, which was reported to be in the left traffic lane 12 or IS feet south of the mailbox. There is no evidence that the mower was moved after the impact. Hence, if it was not pushed by the car, it must have remained in the general area of the impact, since it was not self-propelled.
“We can find no logical explanation for the findings of the State Trooper as to the location of the mower in the left lane, and the indication of a pedestrian being struck in the right traffic lane 10 or 12 feet south of the mailbox other than that of the defendant, that the decedent undertook to cross the highway without ascertaining that it was safe to do so.
“The plaintiff contends that even if the decedent was struck on the pavement, the defendant Marmande had the last clear chance to avoid the accident.
“According to the testimony of the plaintiff herself, she last saw her husband when he was cutting grass on the side of the highway and then her attention was diverted. I gathered from her testimony that there was very little lapse of time between the time she last observed him cutting grass and when the impact took place. The only conclusion I can draw from her testimony is that after she saw her husband, he must have decided to cross the highway, and consequently, he could not have been on the highway long when the Marmande car came along. In fact, he did not even get out of the right lane of the highway, that is, he did not get half way across the highway before he was struck. He was still in the right lane when he was struck, a circumstance that indicates he could not have been on the highway any extended length of time, which leaves some question as to whether the driver had a last chance to avoid the accident.
“It is safe to assume that Marmande could hardly have felt any apprehension before the decedent actually entered upon the pavement. The Trooper’s statistics indicate that Marmande was 115 feet from the point of crossing when he became apprehensive: 66 feet of reaction distance; 39 feet of skid marks to the mailbox, and about 10 feet south of the mailbox to the point of impact. If Marmande was traveling 60 miles an hour, which was the legal speed limit in the area, he traveled at least 1.3 seconds from the point of apprehension to the point of impact. If the decedent was traveling at the rate of about 4 miles per hour, a rate of 5.8 feet per second, then he traveled a distance of about 7.5 feet from the side of the highway to the point of impact in 1.3 seconds. These figures impress us as confirming the findings of the State Trooper. Thus, there was a lapse of 1.3 seconds from the moment of apprehension to the moment of impact. In the absence of any other proof, we are constrained to accept this finding. In such a short lapse of time we can not find that Marmande had any chance, let alone a clear chance.”
On Plaintiff’s objection to Defendants’ attempt to present evidence denying the accident occurred as stated in Article 7 of Plaintiff’s petition, Defendants, Roy J. Marmande and Fireman’s Insurance Company, moved, and the Trial Court granted their request, to' amend their answer instanter by changing their answer to Article 7 of Plaintiff’s petition from “admit” to “deny”. Proof was offered the error resulted from a typographical one on the part of the secretary of counsel, for he introduced a copy of the petition served upon Defendants wherein he had marked each article with “admit” or “deny” before dictating his answer and as to Article 7 the notation was to deny. We further observe in Articles 20 and 21 in the original answer, Defendants specifically alleged *225 the negligence and sole pro'ximate cause of the accident was the gross negligence of Champagne in attempting to cross from the west to the east side of the highway with his lawnmower without first having ascertained that it was safe to cross the highway; in failing to look northerly for vehicular traffic in a southerly direction prior to attempting to cross the highway and in entering the highway for the purpose of crossing from the west to the east side directly into the path of the Marmande automobile at a time when it was impossible for said Marmande to avoid colliding with him. And, alternatively pleading contributory negligence in Article 21 of the answer, Defendants say Champagne was guilty of negligence proximately contributing to the occurrence of the accident for the same reasons enumerated. Such answer in this respect is entirely inconsistent with the admission and contrariwise is additional proof the requested change was properly granted by the Trial Judge. We observe under LSA-C.C.P. Article 1151 the amendment of a petition or an answer is left to the discretion of the trial court and we believe such discretion to have been wisely used in this instance as we cannot believe counsel for Plaintiff was taken by surprise or that he relied upon the erroneous admission to Article 7.
Counsel for Plaintiff additionally contends suit was filed against Voisin and his insurer on the ground that Voisin was racing with Marmande prior to the accident, though Voisin and his insurer answered denying categorically the allegations of Plaintiff’s petition. And availing himself of the procedure for admissions by parties to a suit provided in LSA-C.C.P. Art. 1496, he filed requests for admissions in which were asked questions relating to a purported conversation between Voisin and his insurance agent during which Voisin admitted he was racing prior to the collision. Counsel for Voisin answered the requests for admissions, denying them, within the period for answering required by the ar-tide, though the answer was not signed by Voisin, nor was there filed until the date of trial an affidavit specifically denying matter for which admissions were requested. . Because of the failure to file the requested affidavit, counsel for Plaintiff contends defendant, Voisin, must be held to have admitted the substance of the queries and Plaintiff should have judgment against Voisin.
LSA-C.C.P. Article 1496 is similar to the Federal Rules. In Frankel v. International Scrap Iron and Metal Co., D.C., 157 F.Supp. 709, the Court observed:
“The admissions cannot be taken as controlling. Decision should not be based on mere matters of pleadings or technical admission. As the United States Supreme Court has pointed out at the current term, ‘the purpose of pleading is to facilitate a proper decision on the merits.’ Conley v. Gibson, [355 U.S. 41, 48, 2 L.Ed.2d 80] 78 S.Ct. 99, 103 (Nov. 18, 1957). The opinion by Mr. Justice Black adds:
“ ‘ * * 4= The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive as to the outcome and accept the principal that the purpose of pleading is to facilitate a proper decision on the merits. Cf. Maty v. Grasselli Chemical Co., 1937, 303 U.S. 197, 58 S.Ct. 507, 82 L.Ed. 745 * * *'"
The Trial Court, on the rule to show cause, dismissed Plaintiff’s contention in respect to the admissions. His finding of fact was contrary thereto. A fortiori, the evidence in the case clearly makes evident, to accept said admissions would be making a determination of the issues upon a technical misstep made by counsel, not based on the evidence in the case. His ruling was correct.
Affirmed.